In re Richard M. and Carolyn Z. ROY, Debtors.

Richard M. ROY, Plaintiff,

v.

UNITED STATES of America, Defendant.

Bankruptcy No. 94–11556–JEY.
Adv. No. 94–1145–MWV.

United States Bankruptcy Court,
D. New Hampshire.

Oct. 20, 1995.

John Sullivan, Sulloway, Hollis & Soden, Concord, NH, for Plaintiff.

David Broderick, U.S. Attorney's Office, Concord, NH, for Defendant.

Lawrence Sumski, Amherst, NH, Trustee.

Gerri Karonis, Manchester, NH, for United States Trustee.

## MEMORANDUM OPINION

MARK W. VAUGHN, Bankruptcy Judge.

The Court has before it cross motions for a final declaratory order and a stipulated factual record. The dispute the parties ask this Court to resolve is whether four health education assistance loans taken out by the Plaintiff to finance his dental education remain subject to the dischargeability provisions found at 42 U.S.C. § 292f(g). The Plaintiff, Dr. Roy, consented to judgment against him for these loans in 1990. Dr. Roy argues, among other things, that the consent judgment operated as a novation, thereby making the ordinary discharge provisions of the Bankruptcy Code applicable to the obligations evidenced by the consent judgment. The United States maintains that the strict HEAL discharge provisions remain applicable based on the language of the judgment and the doctrine of merger.

Based upon the stipulated record submitted by the parties and for the reasons set out below, the Court concludes that the HEAL dischargeability provisions apply to the consent judgment. The Court will issue a final judgment consistent with this opinion in favor of the United States. This opinion constitutes the Court's findings of facts and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.

### FACTS

Dr. Roy took out four loans totaling $50,000 through the HEAL program between 1979 and 1982. The loans first became due in March 1984. By 1986, all of these loans were in default and had been transferred by the original lenders to the United States Department of Health and Human Services.

On April 4, 1989, the United States Department of Justice commenced suit against Dr. Roy to recover the total due as of March 31, 1989, of $121,785.60. Dr. Roy and the United States subsequently reached a compromise and on September 18, 1990, the United States District Court for the District of New Hampshire approved a Consent Order of Payment and entered judgment. The United States reduced its claim against Dr. Roy to $106,000 as part of the compromise.

In accordance with the terms of the Consent Order, Dr. Roy paid $15,000 against his loans and signed a promissory note for the $91,000 balance due. The note signed by Dr. Roy is payable in equal monthly installments over 240 months and is secured by two mortgages. The first mortgage was granted by Dr. Roy alone and covers property he individually owns in Wilton, New Hampshire. The second mortgage was granted by Dr. and Mrs. Roy and covers the residence they jointly own in Lyndeboro, New Hampshire. Both mortgages include a waiver of homestead rights. Mrs. Roy also signed a guaranty that limits her liability to her interest in the Lyndeboro property. The Roys' schedules, of which the Court takes judicial notice, indicate that without the mortgage given to the United States, the Roys would jointly hold less than $20,000 equity in the Lyndeboro property.

Other than a reference to the original complaint filed by the United States, the Consent Order does not make mention of the HEAL loans or contain any reference to the applicability of the HEAL discharge provisions. Neither, however, does the Consent Order waive any rights nor expressly release Dr. Roy from his HEAL loan obligations and substitute the judgment note for those obligations. Upon default, the United States may proceed against Dr. Roy, not just on the judgment note, but also on the judgment itself.

From October 1990 to June 1994, Dr. Roy made payments totaling $39,873.47, but nevertheless failed to remain current on his obligations under the Consent Order. Dr. Roy filed for Chapter 13 protection on June 27, 1994. Dr. Roy does not dispute that he received the loans through the HEAL program or that the loans were used for their intended purpose. Dr. Roy earned $52,000 from his dental practice in 1992 and 1993.

### LEGAL STANDARD

■ The parties are seeking a final declaratory order from this Court and have agreed that the stipulated record they filed "shall provide the basis for the Court's ruling in this matter." (Court Doc. No. 8.) The Court, therefore, is free to find facts and draw inferences from that stipulated record. *See RCI Northeast Servs. Div. v. Boston Edison Co.,* 822 F.2d 199, 201–03 (1st Cir. 1987).

### DISCUSSION

In its simplest form, the issue the parties raise is whether a debtor can transform a nondischargeable debt into a dischargeable debt by entering into a settlement agreement. This question is not novel and has been faced by numerous courts, the majority of which have chosen to look beyond the terms of the settlement agreement to the underlying nature and character of the debtor's original liability to determine dischargeability. *E.g., United States v. Spicer (In re Spicer),* 57 F.3d 1152 (D.C.Cir.1995); *Greenberg v. Schools,* 711 F.2d 152 (11th Cir.1983); *In re Peters,* 90 B.R. 588 (Bankr.N.D.N.Y. 1988). Whether the court must always look to the underlying nature and essential character of the debtor's original liability in the face of a settlement agreement, however, is subject to debate.

The Courts of Appeals for the Seventh Circuit and the District of Columbia recently debated this issue, but reached different conclusions. The Court of Appeals for the District of Columbia in *In re Spicer* concluded that a debtor may not alter the form of his or her debt through a settlement agreement, even when that agreement includes an express release or waiver. *Spicer,* 57 F.3d at 1156–57. The rationale for the Court's decision, which involved a fraudulently incurred debt, was that "[s]ettlement makes the dishonest debtor no more honest, and no more entitled to the relief Congress intended to reserve for the honest debtor." *Id.* at 1156. The competing view, articulated by the Seventh Circuit Court of Appeals in *In re West,* is that the settlement agreement, not the underlying liability, will control dischargeability if an express release was given and the parties intended to substitute the new obligation for the old. *In re West,* 22 F.3d 775, 778 (7th Cir.1994).

■ The debate between the Seventh and District of Columbia Circuits is largely irrelevant to this case. There is no express release here, much less any facts which convince the Court that the parties intended to substitute the new obligation for the old. The facts taken as a whole instead lead this Court to conclude that the United States had little, if any, motivation to waive the HEAL discharge provisions, and did not waive those provisions.

First, the terms of the Consent Order called for Dr. Roy to make a $15,000 cash payment within only days after approval of the Consent Order, and monthly payments of $606.67 thereafter. The logical inference drawn from Dr. Roy's agreement to those terms is that he believed he had the capacity to make those payments and so informed the United States. Considering that Dr. Roy not only appeared to have the ability to make substantial monthly payments to the United States, but also the means to make an immediate substantial down payment on the amounts owed, it is difficult to imagine why the United States would have agreed to waive the HEAL discharge provisions.

Under other circumstances the United States' demand for a guaranty and security from a third party might indicate an intent to substitute the new obligation for the old. The guaranty in this case, however, was limited to Mrs. Roy's interest in the Lyndeboro property, an equity interest currently worth less to the United States than the amount by which it compromised its claim. This Court does not believe it to be a reasonable inference that the United States intended the Consent Order and judgment note to extinguish the benefits of the HEAL discharge provisions in consideration of Mrs. Roy's guaranty.

The express terms of the Consent Order also undercut Dr. Roy's argument that the parties intended to substitute the new obligation for the old. Under the Consent Order, the United States may upon default proceed against Dr. Roy on the judgment

**248**

note or the judgment itself. Were the judgment itself standing alone in this case, there would be little doubt that the HEAL discharge provisions apply. *Cf. Joyner v. United States (In re Joyner),* 146 B.R. 232 (Bankr.W.D.Mo.1992); *Emnett v. United States (In re Emnett),* 127 B.R. 599 (Bankr. E.D.Ky.1991).

■ Finally, although the Consent Order does not expressly retain the HEAL discharge provisions, neither does it waive those provisions. The burden is on Dr. Roy, not the United States, to demonstrate that the parties intended to substitute the new obligation for the old. *See Bank of Vermont v. Kelley,* 1994 WL 258680 (D.N.H. Feb. 4, 1994); Fed.R.Civ.P. 8(c). Although the *Spicer* and *West* decisions differ in their final conclusions, one point they agree upon is that public policy does not allow a settlement agreement to silently transform an otherwise nondischargeable obligation into a dischargeable debt. This Court agrees. The fact that the settlement agreement in this case is embodied in a consent judgment only bolsters the Court's conclusion. *In re Roland,* 65 B.R. 1003, 1005 (Bankr.D.Conn.1986) (creditor who succeeds in reducing a claim to judgment should have his chances of recovery enhanced rather than diminished by the existence of that judgment).

■ The history of the dischargeability of HEAL loans and other federally insured student loans in Chapter 13 cases further supports this Court's conclusion that HEAL loans cannot be transformed silently into dischargeable debts. When Congress enacted the Bankruptcy Code in 1978, it gave individuals an incentive to reorganize their affairs under Chapter 13, rather than opt for straight liquidation under Chapter 7, by permitting the discharge in Chapter 13 cases of, among other things, fraudulently incurred debts, HEAL loans, and other federally insured student loans. Congress subsequently narrowed the breadth of the superdischarge, removing HEAL loans from the superdischarge in 1982 and other federally insured student loans in 1990. Pub.L. No. 97–35, Title XXVII, § 2730, 95 Stat. 919 (reenacting the HEAL discharge provisions now codified at 42 U.S.C.A. § 292f(g) (West Supp.1995));

5 *Collier on Bankruptcy* ¶ 1328.01(1)(d)(iv), at 1328–13 (Lawrence P. King ed., 15th ed. 1995) (discussing legislative history of 1990 amendments which made § 523(a)(8) applicable to Chapter 13 debtors). By removing HEAL loans and other federally insured student loans from the superdischarge, Congress made clear its belief that the policy against discharging such loans is strong. In fact, because fraudulently incurred debts remain dischargeable in Chapter 13 cases, the policy against discharging HEAL loans may be even stronger than the policy against discharging fraudulently incurred debts.

■ As one court has noted, "[f]ailure to pay this student loan obviously redounds to the detriment of the taxpayer, and for that matter, the integrity and future of this and other student loan programs." *United States v. Dunevitz (In re Dunevitz),* 94 B.R. 190, 192 (Bankr.D.Colo.1988). The HEAL loan discharge provisions were enacted to prevent individuals who enter the highly remunerative medical profession from discharging their loan obligations without truly extraordinary circumstances. *In re Malloy,* 155 B.R. 940, 945 (E.D.Va.1993), *aff'd,* 23 F.3d 402 (4th Cir.1994) (unpublished disposition); *United States v. Lee (In re Lee),* 89 B.R. 250, 255 (N.D.Ga.1987). The Court's holding, that a debtor may not silently transform a nondischargeable HEAL loan into a dischargeable debt by entering into a settlement agreement, does not foreclose the possibility of Dr. Roy obtaining a discharge of his HEAL loans. It only forecloses Dr. Roy from silently obtaining a discharge of those loans. Public policy and the law, in short, demand more.