**In re Larry Lee WOODY, Debtor.**

**Larry Lee Woody, Plaintiff,**

**v.**

**United States Department of Justice, Defendant.**

**Larry Lee Woody, Plaintiff,**

**v.**

**United States Department of Education, Defendant.**

**Bankruptcy No. 02–21662.**
**Adversary Nos. 02–6095, 02–6096.**

United States Bankruptcy Court, D. Kansas.

Dec. 15, 2005.

Kenneth M. Gay, Consumer Advocate LLC, Lenexa, KS, for Debtor.

## MEMORANDUM OPINION AND ORDER SUPPLEMENTING ORAL FINDINGS AND CONCLUSIONS

ROBERT D. BERGER, Bankruptcy Judge.

On July 12, 2005, the above-captioned adversary proceedings came on for a consolidated hearing.[1] In addition to the findings set forth below and to the extent consistent with this Order, the findings of fact and conclusions of law recorded in open court constitute the complete grounds for the Court's action, as required by Fed. R. Bankr.P. 7052 and Fed.R.Civ.P. 52.

### *Factual Background*

Plaintiff/debtor Larry Lee Woody seeks to discharge two different types of student loans. Dischargeability of the first type of student loan is determined by the familiar standard prescribed by § 523(a)(8). The obligation governed by the § 523(a)(8) dischargeability standard (the "523 Loan")

---

**1.** Plaintiff/debtor Larry Lee Woody appears by his attorney, Kenneth M. Gay of Consumer Advocate LLC, Lenexa, KS 66215. The United States Department of Justice and the United States Department of Education appear by their attorneys, Christina L. Medeiros and Melanie D. Caro, Assistant United States Attorneys, Kansas City, KS 66101.

arises from a series of loans which originated between 1979 and 1983. From an original aggregate obligation of $25,000.00, Mr. Woody now owes more than $53,000.00 on the 523 Loan.[2] The dischargeability of the second type of student loan is determined by the standard prescribed by the Health Education Assistance Loan ("HEAL") program. The obligation governed by the HEAL dischargeability standard (the "HEAL Loan") originated in 1982 from Mr. Woody's pursuit of a chiropractic degree. From an original principal debt of $4,700.00, Mr. Woody now owes more than $18,750.00 on the HEAL Loan.[3]

In applying the relevant law in both proceedings, the Court believes Mr. Woody's financial condition, age, health, job history, and accumulated wealth are important considerations. To that end, an overview of the record and Mr. Woody's testimony, which the Court finds credible, concerning his recent financial past and current financial condition is an appropriate place to begin.

| *Annual Income* | *Adjusted Gross Income—Federal Tax Return* | | |
|---|---|---|---|
| 1999 | $ 14,182.00 | | |
| 2000 | 9,216.00 | | |
| 2001 | 17,428.00 | | |
| 2002 | 19,030.00 | | |
| 2003 | 21,235.00 | | |
| 2004 | 27,143.00 | | |

*Estimated Gross Monthly Income*

| | | | |
|---|---|---|---|
| 2005 | $ 3,065.00 | | |
| 2006 | 3,210.00 | | |

| *Estimated Monthly Payroll Deductions* | | 2005 | 2006 |
|---|---|---|---|
| Taxes and Social Security | | $ 655.00 | $ 700.00 |
| Insurance | | 137.00 | 163.00 |
| Flexible Spending Account | | 72.00 | 125.00 |
| Federal Retirement | | 24.00 | 26.00 |
| 401(k) | | 210.00 | 221.00 |
| Union Dues | | 26.00 | 26.00 |
| TSP Loan | | 85.00 | 85.00 |
| TOTAL: | | $ 1,209.00 | $ 1,346.00 |

*Estimated Net Monthly Income*

| | | | |
|---|---|---|---|
| 2005 | $ 1,856.00 | | |
| 2006 | 1,864.00 | | |

| *Estimated Monthly Living Expenses* | | 2005 | 2006 |
|---|---|---|---|
| Apartment Rent | | $ 585.00 | $ 595.00 |
| [Storage Rental] | | 125.00 | 125.00 |
| Electricity | | 50.00 | 55.00 |
| Natural Gas | | 0.00 | 0.00 |
| Water/Sewer | | 20.00 | 20.00 |
| Cable/Satellite/Internet | | 17.00 | 17.00 |

**2.** As of July 12, 2005, Mr. Woody owed $53,241.16 ($23,794.18 principal, $29,359.98 interest, $87.00 administrative costs) with interest accruing annually on the principal at 7% or $4.54 per day.

**3.** As of July 12, 2005, Mr. Woody owed $18,759.19 ($18,541.92 principal, $217.27 interest) with interest accruing annually at 4.550% or $2.31 per day.

| | | |
|---|---:|---:|
| Telephone | 80.00 | 80.00 |
| Food | 200.00 | 200.00 |
| Clothing/Bedding | 30.00 | 30.00 |
| Laundry | 25.00 | 25.00 |
| Medical & Dental After Reimbursement | 128.00 | 75.00 |
| Personal Grooming | 13.00 | 15.00 |
| Recreation/Entertainment | 75.00 | 95.00 |
| Car Payment | 125.00 | 125.00 |
| Gasoline | 80.00 | 90.00 |
| | | |
| Auto Repairs/Maintenance | 70.00 | 70.00 |
| Auto Insurance/Road Service | 42.00 | 42.00 |
| Auto Licenses/Personal Property Tax | 6.00 | 6.00 |
| Renter's Insurance | 15.00 | 15.00 |
| Health/Dental/Vision Insurance | | |
| (not paid elsewhere) | 60.00 | 60.00 |
| Charitable Contributions | 25.00 | 25.00 |
| Office Supplies/Bank Charges, etc. | 17.00 | 20.00 |
| Interest Expense | 9.00 | 0.00 |
| Union Dues | 4.00 | 0.00 |
| Installment/Credit Card Payments | 100.00 | 0.00 |
| TOTAL: | $ 1,901.00 | $ 1,785.00 |

*Estimated Monthly Income After Expenses*

| | |
|---|---:|
| 2005 | ($45.00) |
| 2006 | $79.00 |

Because Mr. Woody failed to complete the education necessary to become a health care professional, he has never worked as a chiropractor. Instead, the record shows that prior to 1998, Mr. Woody's employment history is quite varied. With the exception of two years with no income, Mr. Woody has held a number of jobs with annual income that, while varying considerably, rarely surpassed $15,000.00. From 1998 until early 2001, Mr. Woody held a number of temporary positions and collected unemployment compensation, presumably during the periods he was eligible for such compensation. The record does not suggest that Mr. Woody quit or was fired from any of the temporary positions he has held or that he has otherwise abused his right to collect unemployment benefits. Since early 2001, Mr. Woody has been employed by the Internal Revenue Service ("IRS"). During his initial time with the IRS, his employment, although seasonal and interrupted by furloughs, was fairly consistent. Mr. Woody was able to retain certain IRS employee benefits, such as medical insurance, during at least a portion of the time he was furloughed. Most recently, the IRS has offered and Mr. Woody has accepted full-time employment. However, Mr. Woody's credible testimony reflects that it is highly unlikely his income will increase materially, either by promotion or other means, over the amount he is now earning.

Over the last several years, Mr. Woody has managed to save a pittance for retirement. Recently, he has increased his efforts to save for retirement through tax-deferred retirement plans, likely because his ability to provide for himself upon his impending retirement is currently unrealistic. At the age of 58, Mr. Woody's contribution of only $234.00 per month to such plans, even when combined with his employer's matching contribution and Social Security benefits, in no way guarantees he will be capable of providing for himself upon retirement. Any remaining accumulation of personal wealth by Mr. Woody is insignificant. Mr. Woody owns no real property and virtually no personal property of note except for his retirement ac-

counts and an insurance policy with cash value. These are negated by the state of his transportation: a fifteen-year-old pickup truck with a rebuilt engine that will undoubtedly need repairs or replacement in the near future.

Mr. Woody is not a shining example of good health. He suffers from heart disease and endures the medical fall-out associated with a recent heart attack. His medical expenses are substantial and are likely to increase over time. Mr. Woody is attempting to maximize his income by contributing tax-free dollars to a flexible spending account ("FSA") that will then reimburse him, without penalty, for any actual medical expenses he incurs. Although voluntary, Mr. Woody's monthly contribution to the FSA is a prudent means for maximizing his disposable income. Mr. Woody's monthly disposable income, if any, would actually decrease were he to cease making contributions to the FSA because his ongoing medical expenses would then be paid from post-tax income.

Although the Department of Education has received $995.00 toward Mr. Woody's 523 Loan through Treasury Department offsets, Mr. Woody has not made any payments thereon voluntarily. He made only one payment of $484.48 toward the HEAL Loan in 1987.

### Discussion

■ The Court's analysis involves the consideration of two questions. The first is whether not discharging Mr. Woody's 523 Loan would create an "undue hardship" on Mr. Woody under Title 11 U.S.C. § 523(a)(8). The second is whether not discharging Mr. Woody's HEAL Loan would be "unconscionable" under Title 42 U.S.C. § 292f(g)(2). The unconscionability standard under § 292f(g)(2) is stringent, demanding more than the undue hardship standard under § 523(a)(8).[4] Because two different standards control discharge of Mr. Woody's loans, the loans must be considered separately.[5] The dischargeability of the 523 Loan should be considered first, because its discharge under the lesser undue hardship standard might affect the more stringent unconscionability analysis associated with the discharge of the HEAL Loan.[6]

### A. Nondischarge of 523 Loan would impose an undue hardship under Title 11 U.S.C. § 523(a)(8).

■ The Tenth Circuit, in *In re Polleys*, adopted what is commonly referred to as the *"Brunner* test," holding that in order to establish an undue hardship, a debtor must prove:

(1) that the debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for herself and her dependents if forced to repay the loans;

(2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and

(3) that the debtor has made good faith efforts to repay the loans.[7]

■ The court observed that "to better advance the Bankruptcy Code's 'fresh start' policy and to provide judges with the discretion to weigh all the relevant consid-

---

4. *U.S. Dep't of Health & Human Services v. Smitley (In re Smitley),* 347 F.3d 109, 116–17 (4th Cir.2003).

5. *Id.* at 121.

6. *Id.*

7. *Educ. Credit Mgmt. Corp. v. Polleys (In re Polleys* ), 356 F.3d 1302, 1309 (10th Cir. 2004).

erations, the terms of the test must be applied such that debtors who truly cannot afford to repay their loans may have their loans discharged." [8] In addition, the court directed that in applying the "good faith" portion of the test, bankruptcy courts "should consider whether the debtor is acting in good faith in seeking the discharge, or whether he is intentionally creating his hardship." [9]

**1. Mr. Woody cannot maintain, based on his current income and expenses, a "minimal" standard of living for himself if forced to repay his 523 Loan obligation.**

■ Under the first element of the *Brunner* test, a debtor must show that he cannot maintain, based on his current income and expenses, a "minimal" standard of living if forced to repay his student loan debt.[10] Here, it is not immediately apparent from the record under what terms, if any, Mr. Woody would be eligible to resume participation in a loan repayment program, income contingent or otherwise. However, this Court does not need such details to evaluate Mr. Woody's ability to maintain a "minimal" standard of living in this case. It is clear from the record that, even without paying the 523 Loan, Mr. Woody barely maintains a minimal standard of living.

None of Mr. Woody's projected expenses are unreasonably high. In fact, they are too low. His monthly apartment rent, even including the added cost of his storage rental, is low compared to those this Court regularly sees for similarly situated debtors. Mr. Woody's expenses for food, clothing, laundry, personal grooming, and recreation are also low when compared to the expenses of other similarly

situated debtors. In addition, Mr. Woody drives an automobile that is at least fifteen years old. Although the automobile has a recently rebuilt engine, Mr. Woody's projected monthly car payment of $125.00 and monthly auto repair expense of $70.00 are unrealistically low for an automobile that is driven daily. Mr. Woody's projected expense for gasoline consumption is also inadequate. His monthly expenses for automobile use and operation might seem more reasonable if he provided a miscellaneous category for expenses.

In fact, noticeably absent from the record is how Mr. Woody pays for the day-to-day costs of living such as light bulbs, toilet paper, and napkins, as well as unexpected expenses that cannot be anticipated but certainly occur over time, *e.g.*, deaths in the family, the costs of replacing an automobile, and unforeseen medical expenses. It is likely that instead of anticipating and paying such miscellaneous expenses as they arise, Mr. Woody will be forced to incur debt or to borrow from his retirement account.

However, as noted by defense counsel, Mr. Woody appears to have a few voluntary expenses that appear unnecessary for him to maintain a "minimal" standard of living. Namely, Mr. Woody currently contributes $72.00 per month towards an FSA, as discussed *supra,* and leases a storage facility on the same premises as his apartment for $125.00 per month. In addition, Mr. Woody pays $30.00 monthly for union dues, $236.00 monthly toward saving for retirement, and $85.00 monthly toward a loan against his retirement savings. Defense counsel argues that because the aforementioned expenses are both voluntary and unnecessary, Mr. Woody

8. *Id.*

9. *Id.*

10. *Id.* at 1307.

should instead be forced to contribute these payments toward his student loans.

■ As discussed *supra*, even if Mr. Woody discontinues his contributions toward the FSA, his ongoing health expenses are not likely to diminish and, accordingly, his monthly disposable income, if any, will decrease because of the associated tax consequences. The storage facility, union dues, retirement contributions, and loan repayment pose a more intriguing question: Can voluntary expenses that do not immediately affect a debtor's standard of living nevertheless be necessary to maintain a "minimal" standard of living if the payments thereon were instead applied to repay a student loan? Under the appropriate circumstances, the answer is yes. This Court's experience suggests that many debtors actually understate expenses and that in reality it is impossible to forecast unavoidable but significant expenses. Mr. Woody is no different as his budget provides meager allowances for essentials and is devoid of a monetary contingency for unexpected events.

For example, the Court takes judicial notice of the price of gasoline which nearly doubled in a matter of days because a powerful hurricane made landfall on the United States' southern coastline.[11] Mr. Woody's projected expenses make no provision for such unexpected, yet inevitable occurrences. While such unexpected events impose additional hardship on any debtor, the resulting hardship on Mr. Woody would be undue because he would be incapable of affording essential expenses and deprived of the ability to maintain his minimal lifestyle if forced to repay his student loans. Further, Mr. Woody projects monthly auto payments of $125.00 and auto repair and maintenance expenses of $70.00. Despite the fact that Mr. Woody's fifteen-year-old pickup has a recently rebuilt engine, common sense is that a fifteen-year-old vehicle that is an individual's primary source of transportation will either need more than $70.00 in monthly repairs averaged over time to remain roadworthy or it will need replacement by a vehicle costing more than $125.00 a month can buy.[12]

11. The Federal Rules of Evidence permit a court to take judicial notice of facts that are either "(1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." FED.R.EVID. 201. Since it is common knowledge that the price of gasoline doubled, and in some places nearly tripled, in the aftermath of hurricanes Katrina and Rita, the Court takes judicial notice of the same.

12. The local transportation expense standards promulgated by the Internal Revenue Service ("IRS") and used in applying the means test prescribed by the recently amended 11 U.S.C. § 707 allow debtors living in the Kansas City metropolitan region who seek bankruptcy protection a monthly operating and ownership expense for one car of $291.00 and $475.00, respectively. *See* United States Trustee Program, *Means Testing: IRS Local Transportation Expense Standards, Midwest*

*Census Region*, http://www.usdoj.gov/ust/bap cpa/bci—data/IRS—Trans—Exp—Stds—MW. htm (last visited on Nov. 4, 2005). While not determinative of the actual expenses Mr. Woody will incur over time to maintain adequate transportation, the IRS standards, which are used in evaluating a debtor's ability to repay his debts, do provide insight into the auto expenses a debtor should reasonably expect to incur over time. In this case, Mr. Woody's projected monthly auto ownership cost of $125.00, which is approximately only a quarter of the auto ownership cost allowed by the means test, is simply too low to be maintained over time. In light of the IRS standards, Mr. Woody's projected monthly auto operating expenses are equally unrealistically low. Mr. Woody's projected monthly auto expenses for 2005 total only $323.00 [$125.00 car payment + $80.00 gasoline + $70.00 auto repair + $42.00 auto insurance + $6.00 auto license], or $443.00 less than the $766.00 combined expense allowed by the

■ Although counsel's role is to aid debtors in accurately completing their schedules, it is within the province of this Court to account for over– and understatements of scheduled expenses within the totality of the circumstances. In this case, to conclude that the amount of income Mr. Woody directs toward his storage facility rental, union dues, and retirement savings is unnecessary for him to maintain a minimal standard of living belies reality. The reality is that Mr. Woody will either have to redirect his seemingly "unnecessary" expenditures toward inevitable life expenses as they occur, *e.g.,* the higher than projected costs of auto repairs/replacement, unexpected healthcare costs, and miscellaneous needs of everyday life, or he will have to incur debt by using credit cards or by borrowing against the minimal retirement savings he has accumulated, which will, in turn, increase his monthly expenses. More likely, Mr. Woody will have to redirect his seemingly unnecessary expenditures to cover life's basic necessities *and* incur debt simply to maintain a minimal standard of living. Under any scenario, to require Mr. Woody to devote toward repaying his 523 Loan the income he is currently directing toward his storage facility, union dues, retirement savings, and loan repayment would deprive him of maintaining a minimal standard of living.

Although the Court finds Mr. Woody's expenditures toward retirement will inevitably be redirected to maintain his minimal standard of living, to otherwise deny his ability to contribute reasonable funds to a retirement plan contradicts the public policy reflected in the Congressional encouragement of self-sustained retirement and, further, would improperly penalize an individual who must either self-fund his own retirement or place his future in the hands of a social welfare system regularly criticized for its inadequacy. Even more troubling, should Mr. Woody's student loan obligations remain unsatisfied upon his retirement, the inevitable result of excepting the debt from discharge, the United States may offset any Social Security benefit he is entitled to in satisfaction thereof.[13] There is little reason for a "fresh start" that will only be answered with a substantial incapacity to provide for oneself during old age. In other words, to deprive Mr. Woody of the ability to plan for maintaining his minimal lifestyle once he grows too old or too ill to continue working necessarily deprives him of his ability to maintain a minimal standard of living in the foreseeable future and is inconsistent with the Tenth Circuit's directive "that debtors who truly cannot afford to repay their loans may have their loans discharged."[14]

Even if the income Mr. Woody is currently directing toward his storage facility, union dues, retirement savings, and loan repayment were truly excess income and unnecessary to maintaining a minimal standard of living, which this Court does not find, forcing Mr. Woody to repay his student loans would still deprive him of the ability to maintain a minimal standard of living. Excluding Mr. Woody's monthly FSA contribution for the reasons discussed *supra,* Mr. Woody currently directs $474.00 monthly toward his storage facility, union dues, retirement savings, and loan repayment. For simplicity's sake, assuming Mr. Woody's 523 and HEAL

IRS means test standards for owning and operating a single vehicle.

**13.** *Lockhart v. United States,* —— U.S. ——, 126 S.Ct. 699, —— L.Ed.2d —— (2005) (concluding the United States may offset Social

Security benefits to collect student loan debt that has been outstanding for over 10 years).

**14.** *Polleys,* 356 F.3d at 1309.

Loans were consolidated with interest accruing annually thereon at a fixed rate of 4.550%, his monthly payment over 25 years would be more than $400.00. However, in 25 years, Mr. Woody will be eighty-three years old and will have long since grown too old to be reasonably capable of servicing a monthly payment of that size. Under the same circumstances, should Mr. Woody wish to repay his student loan debt within the next 12 years, or by age 70, he would need to make monthly payments approaching $650.00, which is far beyond Mr. Woody's ability to pay. Whether Mr. Woody's monthly student loan payments total $400.00 or $650.00, he remains incapable of servicing the debt while maintaining a minimal standard of living in the foreseeable future.

Finally, because there is no guarantee Mr. Woody will be allowed to resume a student loan repayment program, it is also possible Mr. Woody's earnings will be subject to garnishment. The Department of Education (the "DOE") has the authority to commence non-judicial wage garnishment proceedings against Mr. Woody to collect from 10 to 15 percent of his disposable earnings.[15] Alternatively, the DOE could seek judgment against Mr. Woody on the 523 Loan and proceed with the judicial collection process, which would allow the DOE to garnish as much as 25 percent of his earnings.[16] Regardless of whether 10 percent or 25 percent of his earnings are subject to garnishment, any act by the DOE to garnish Mr. Woody's earnings would inevitably deprive Mr. Woody of the ability to maintain a minimal lifestyle with his current level of income.[17]

## 2. Additional circumstances exist indicating that Mr. Woody's state of affairs is likely to persist for a significant portion of the repayment period of the student loans.

 When applying the second *Brunner* element, the Tenth Circuit observed:

> [C]ourts need not require a "certainty of hopelessness." Instead, a realistic look must be made into debtor's circumstances and the debtor's ability to provide for adequate shelter, nutrition, health care, and the like. Importantly, "courts should base their estimation of a debtor's prospects on specific articulable facts, not unfounded optimism," and the inquiry into future circumstances should be limited to the foreseeable future, at most over the term of the loan.[18]

 In the present case, it is clear that Mr. Woody is a simple man who has reached the pinnacle of his earning potential. With his work history, current age, and state of health, Mr. Woody's prospect for increased salary is negligible. The foreseeable future does not include the promise of improved circumstances for Mr. Woody. Rather, since an individual's health generally deteriorates with age, it is more likely that Mr. Woody's future holds greater hardship as his earning capacity diminishes and his medical expenses increase. At best, even if Mr. Woody's health and financial circumstances remain unchanged, or even improve slightly, he cannot afford to repay within the foreseeable future both the 523 Loan obligation of more than $53,000, plus accruing interest,

**15.** *See* the Higher Education Act, 20 U.S.C. § 1095a; the Debt Collection Improvement Act of 1996, 31 U.S.C. § 3720D.

**16.** *See* 15 U.S.C. § 1673(a); K.S.A. § 60–2310(b).

**17.** For additional discussion on garnishment *See* p. 448, *infra*.

**18.** *Polleys,* 356 F.3d at 1310 (citation omitted).

and the HEAL Loan obligation of more than $18,750.00.

As discussed *supra*, Mr. Woody's expenses seem unreasonably low, and any significant reduction in his living expenses would most likely be offset by future expenses. This Court agrees with Judge Karlin who, in *In re Quarles*,[19] observed that even where a car might soon be paid off, "to completely deduct that payment from the Debtor's monthly expenses ignores the fact that the nine year old car will almost certainly need to be replaced at some point in the near future."[20] In addition, as cars grow older, "there will likely be an increase in maintenance costs for the aging car until it is replaced."[21] As noted *supra*, because Mr. Woody's projected monthly expenses of $125.00 for car payments, $70.00 for maintenance, and $80.00 for gasoline are unrealistically low, an increase in Mr. Woody's monthly expenditures is inevitable. For example, exclusive of sales tax and licensing fees, a used car purchased for $8,000.00 and financed at 7.8 percent, which in this Court's experience is low for an individual with recent financial troubles, will cost approximately $250.00 monthly, or twice the amount Mr. Woody currently projects for his monthly car payment, over a standard three-year repayment period. As used cars seldom carry extended warranties, any purchase will be accompanied by continuing maintenance and repair expenses which will inevitably average at least twice the $70.00 per month or $840.00 annually that Mr. Woody projected.[22]

In light of the foregoing, the Court finds that additional circumstances exist indicating Mr. Woody's state of affairs is likely to persist for a significant portion of the repayment period of the student loans.

### 3. Mr. Woody has made good faith efforts to repay his student loans.

 The Tenth Circuit directed that a court's inquiry into the third *Brunner* element, a debtor's good faith, "should focus on questions surrounding the legitimacy of the basis for seeking a discharge."[23] "[T]he failure to make a payment, standing alone, does not establish a lack of good faith."[24] However, "a debtor who willfully contrives a hardship in order to discharge student loans should be deemed to be acting in bad faith."[25] While participation in a repayment program is not required to establish good faith, weight should be given to the steps a debtor takes prior to filing for bankruptcy in determining whether the debtor is acting in good faith.[26] In *Polleys*, the Tenth Circuit held that "the debtor's efforts to cooperate with her lenders show that she was acting in good faith in working out a repayment plan."[27]

 Here, Mr. Woody has failed to make a voluntary payment toward his 523 Loan. Nevertheless, the Court finds that

19. *Quarles v. Educational Credit Management Corporation (In re Quarles)*, No. 02–7089, 2004 WL 2191608, at *7 (Bankr.D.Kan. April 22, 2004) (agreeing with Judge Pusateri's decision in *Innes v. State of Kansas, et al. (In re Innes)*, Adv. No. 95–7104 at 12 (Bankr.D.Kan. Dec. 22, 2000)).

20. *Quarles*, 2004 WL 2191608, at *7.

21. *Id.*

22. *See* n. 12, *supra*.

23. *Polleys*, 356 F.3d at 1310.

24. *Id.* at 1311 (citing *In re Coats*, 214 B.R. 397, 405 (Bankr.N.D.Okla.1997)).

25. *In re Alderete*, 412 F.3d 1200, 1206 (10th Cir.2005).

26. *Id.*

27. *Id.* (citing *Polleys*, 356 F.3d at 1312).

Mr. Woody has not contrived to create a hardship. He is an unsophisticated debtor who has throughout the years maximized his income and minimized his expenses. Mr. Woody could do little more to minimize his monthly expenses or increase his income potential. His failure to maximize his personal and professional resources is derived not from a willful attempt to contrive a hardship, but from a lack of sophistication and capability, which is beyond his control. When sufficiently healthy, Mr. Woody has continually sought full-time employment and has worked through temporary agencies when no other full-time work could be found. Despite Mr. Woody's past and current employment, the Court finds that his income was and is insufficient to support payments toward his student loans. It is clear from the record that Mr. Woody has been trying his best in good faith to maximize his personal and professional resources, but that circumstances beyond his control have kept him from repaying his student loans.

In addition, Mr. Woody's efforts to cooperate with his lenders is indicia of his good faith. Evidence admitted at trial by stipulation, although unnecessary to this Court's conclusion, shows that on the few occasions Mr. Woody had conversations with loan representatives, a number of which were initiated by Mr. Woody, repayment options were discussed and, on at least one occasion, Mr. Woody requested a consolidation application be sent. In other conversations, Mr. Woody indicated he was simply unable to afford repayment. These conversations, although sporadic, indicate Mr. Woody's good faith intent to cooperate and his desire, if possible, to repay his student loan debt.

Finally, there is no indication that Mr. Woody is "attempting to abuse the student loan system by having [his] loans forgiven before embarking on lucrative careers in the private sector." [28] Mr. Woody never completed his professional degree and at his age, considering his state of health, he would not be capable of developing a lucrative practice as a chiropractor, even if he could complete his studies in chiropractic medicine after a two-decade absence from the classroom. There is also no evidence that Mr. Woody could have otherwise increased his earning potential using his skills in accounting. Mr. Woody has sought and held positions throughout his working life and currently holds a position that utilizes his skills in accounting. The evidence before the Court, including Mr. Woody's credible testimony, is that Mr. Woody has maximized his earning potential and is at the limit of his professional capabilities.

Given the facts of this case, the Court finds that Mr. Woody's failure to make voluntary payments toward his 523 Loan does not establish that he is acting in bad faith. Because Mr. Woody has shown that he has made good faith efforts to maximize his earning potential and minimize his expenses, the Court finds that he has made a good faith effort to repay his student loans. The evidence admitted at trial by stipulation regarding Mr. Woody's telephone conversations with student loan officials is additional indicia of his good faith and desire to repay his student loans, although it is clear he was unable to do so because of unemployment or insufficient income.

The Court finds that repayment of Mr. Woody's 523 Loan would constitute an undue hardship. Mr. Woody cannot afford to repay any of the 523 Loan while maintaining a minimal standard of living. Mr. Woody's current financial inability to repay his student loans is likely to continue,

---

**28.** *Polleys,* 356 F.3d at 1312 (citing *In re* *Cheesman,* 25 F.3d 356 (6th Cir.1994)).

if not worsen, throughout any repayment period. Finally, Mr. Woody has demonstrated good faith despite his failure to make any voluntary payments toward the 523 Loan. Having satisfied each part of the *Brunner* test, Mr. Woody is entitled to discharge his 523 Loan debt.

### B. Nondischarge of HEAL Loan would be unconscionable under Title 42 U.S.C. § 292f(g)(2).

Before a student loan may be discharged under Title 42 U.S.C. § 292f(g)(2), the following must occur:

(1) the expiration of the seven-year period beginning on the first date when repayment of such loan is required, exclusive of any period after such date in which the obligation to pay installments on the loan is suspended;

(2) a finding by the Bankruptcy Court that the nondischarge of such debt would be unconscionable; and

(3) the Secretary [of Health and Human Services] shall not have waived certain rights.

 The parties have agreed by pretrial stipulation that the sole question before this Court is whether the nondischarge of Mr. Woody's HEAL Loan is unconscionable under § 292f(g)(2). Although § 292f(g)(2) does not define the term "unconscionable," most courts agree the term should be given its plain meaning of "excessive, exorbitant," "lying outside the limits of what is reasonable or accept-

able," "shockingly unfair, harsh, or unjust," or "outrageous." [29] Most courts also agree that the standard imposed by this definition of the term "unconscionability" be more stringent than the "undue hardship" standard imposed by 11 U.S.C. § 523(a)(8).[30]

The Fourth Circuit, in *In re Smitley*,[31] and the Sixth Circuit, in *In re Rice*,[32] the only Circuit courts to consider discharge pursuant to § 292f(g)(2), have adopted a "totality of the circumstances" approach to determining whether the nondischarge of a HEAL loan would be "unconscionable." [33] In evaluating the "totality of the circumstances," the Fourth and Sixth Circuits point to a laundry list of factors a bankruptcy court should consider, including:

(1) the debtor's income, earning ability, health, educational background, dependents, age, accumulated wealth, and professional degree;

(2) the debtor's standard of living, with a view toward ascertaining whether the debtor has attempted to minimize the expenses of himself and his dependents;

(3) whether the debtor's current situation is likely to continue or improve, including whether the debtor has attempted to maximize his income by seeking or obtaining stable employment commensurate with his educational background and abilities;

(4) whether the debtor could supplement his income through secondary

**29.** *See U.S. Dep't of Health & Human Services v. Smitley (In re Smitley)*, 347 F.3d 109, 116 (4th Cir.2003); *Rice v. United States (In re Rice)*, 78 F.3d 1144, 1148–49 (6th Cir.1996).

**30.** *Id., but see In re Birrane*, 287 B.R. 490, 495 (9th Cir. BAP 2002) (concluding "the application of the 'undue hardship' standard requires a finding that it would be 'unconscionable' to require the debtor to take steps

to earn more income or reduce her expenses.'').

**31.** 347 F.3d 109.

**32.** 78 F.3d 1144.

**33.** *Smitley,* 347 F.3d at 117; *Rice,* 78 F.3d at 1149.

part-time or seasonal work, even if already employed full time;

(5) whether the debtor's dependents are or could be contributing financially to their own support;

(6) the amount of the debt and the rate of interest; and

(7) the debtor's role in accruing the amount of debt, including requesting multiple forbearances and making minimal repayments.[34]

Unfortunately, as observed by the Tenth Circuit, "[l]egal rules have value only to the extent they guide primary conduct or the exercise of judicial discretion."[35] "Laundry lists, which may show ingenuity in imagining what could be relevant but do not assign weights or consequences to the factors, flunk the test of utility."[36] Accordingly, this Court believes the Tenth Circuit would agree with Judge Michael's dissenting opinion in *In re Smitley*,[37] where he observed that while the laundry list of factors used in evaluating the "totality of the circumstances" should be used as a general guide to the examination of the debtor's overall circumstances and his efforts, the list should not be used "to reduce the unconscionability analysis to some rigid, formula-driven calculation."[38] Judge Michael concluded that the "fairly broad definitional range [of 'unconscionable'] should give a bankruptcy court some latitude in deciding whether to find that nondischarge would be unconscionable."[39] This is because "it is easier to find that nondischarge would '[l]ie outside the limits of what is reasonable' than it is to find that nondischarge would be 'shockingly unfair' or 'outrageous.' "[40]

Judge Michael believes that an "unconscionability" determination is an equitable one, and "[i]n the end, the debtor's good faith, or lack of it, must count for a lot."[41] This Court also believes it is important to consider the consequences nondischarge of a HEAL loan will have on the debtor and whether those consequences will prevent the debtor from maintaining a minimal standard of living into the foreseeable future. For example, it would obviously be inequitable to allow a young professional, who possesses real earning potential, to discharge a student loan before it has been established by the evidence that the individual will not be able to maintain a "minimal" standard of living if the loan is not discharged. Without such a showing, the young professional would stand to receive a substantial windfall by the discharge of his HEAL loans, which is inconsistent with Congress's obvious intent that individuals who enter the highly remunerative medical profession may not discharge their loan obligations without truly extraordinary circumstances.[42]

34. *Smitley,* 347 F.3d at 117; *Rice,* 78 F.3d at 1149–50.

35. *Polleys,* 356 F.3d at 1309.

36. *Id.*

37. *Smitley,* 347 F.3d at 124 (Michael, J., dissenting).

38. *Id.* at 125.

39. *Id.*

40. *Id.*

41. *Id.* (citing *In re Rice,* 78 F.3d at 1150).

42. *Roy v. United States (In re Roy),* 189 B.R. 245, 248 (Bankr.D.N.H.1995) ("The HEAL loan discharge provisions were enacted to prevent individuals who enter the highly remunerative medical profession from discharging their loan obligations without truly extraordinary circumstances.") (citing *In re Malloy,* 155 B.R. 940, 945 (E.D.Va.1993), *aff'd,* 23 F.3d 402 (4th Cir.1994) (unpublished disposition)).

 Conversely, it would also be inequitable to deny an individual with poor health and minimal lifestyle the discharge of his student loans if he has neither the potential to substantially increase his income nor the ability to maintain his minimal lifestyle into the foreseeable future if forced to repay the loan. For the individual who is maximizing his income to the extent of his capabilities, yet is only able to provide himself a minimal lifestyle, the consequences of nondischarge are "outside the limits of what is reasonable" and become "shockingly unfair" or "outrageous" if nondischarge of the student loan will deprive the individual of the ability to maintain his health and minimal lifestyle.

 It may be beneficial, at this point, to briefly summarize the analysis courts should utilize in determining the dischargeability of a HEAL obligation. In an "unconscionability" analysis, a court should look to the plain meaning of the word "unconscionable" in determining whether, within the totality of the circumstances, nondischarge of a HEAL obligation is appropriate. A court should look to factors used by other courts for guidance in examining the totality of the circumstances, but should avoid employing the factors as a rigid, formula-driven calculation. Weight should be given to a debtor's good faith, or lack thereof. In addition, a court should consider the likely consequences nondischarge of a HEAL obligation will have on the debtor and whether those consequences will adversely affect the debtor's ability to maintain a minimal standard of living into the foreseeable future.

Because many of this Court's findings under the *Brunner* test are equally applicable under an "unconscionability" analysis, the Court incorporates the same here. In addition, the Court will revisit a number of factors with specific regard to an "unconscionability" analysis.

### (1) Accumulated wealth, income and ability to pay.

 As noted under the Court's "undue hardship" analysis, *supra*, any excess income Mr. Woody may appear to have each month will ultimately be necessary for him to maintain his minimal lifestyle. Mr. Woody's automobile maintenance cost will inevitably go up or he will need to purchase a new vehicle, and he has made no provisions for miscellaneous expenses or unexpected health care expenses. Mr. Woody's lack of sophistication and forethought to realistically estimate his future living expenses should not prevent him from discharging his student loans if he is truly incapable of maintaining a basic standard of living. Raising Mr. Woody's unrealistically low estimated expenses to realistic levels will ultimately deprive him of the ability to continue making payments toward voluntary expenses that are unnecessary for him to maintain his minimal, if not meager, lifestyle.

When an unexpected health event occurs or the need to replace his car arises, Mr. Woody's contributions toward voluntary and unnecessary expenses will be redirected to expenses that are necessary to sustain his minimal lifestyle. Most likely, if this Court excepts Mr. Woody's HEAL obligation from discharge, he will have no choice but to seek bankruptcy relief again at a later date.[43] It makes little sense for

---

**43.** The Court also notes that the plain language of 11 U.S.C. § 523(b) clearly directs that a loan excepted from discharge under section 733(g) of the Public Health Service Act [42 U.S.C. § 292f(g)] in a prior case is dischargeable in a subsequent bankruptcy under the "undue hardship" standard of 11 U.S.C. § 523(a)(8). *See In re Tanski,* 195 B.R. 408 (Bankr.E.D.Wis.1996).

this Court to except Mr. Woody's HEAL Loan from discharge knowing that, as a result, Mr. Woody will likely be condemned to seek bankruptcy relief again in the future.

Even if Mr. Woody could afford to make minimal monthly payments toward his HEAL Loan debt, which he cannot, he has no guaranteed right to resume participation in a monthly payment program on the obligation. Because Mr. Woody's HEAL obligation has been reduced to judgment, his disposable income, or "that part of the earnings of any individual remaining after the deduction from those earnings of any amounts required by law to be withheld," [44] may be subject to garnishment of up to 25 percent for any work week.[45] Assuming Mr. Woody ceases further retirement plan contributions and excludes from his earnings "amounts required by law to be withheld," which includes Social Security taxes and federal, state, and local withholding taxes, Mr. Woody's projected monthly earnings for 2005 that will be subject to wage garnishment will be roughly $2,410.00. Of that amount, as much as $602.50 may be garnished.[46] Mr. Woody's projected monthly earnings for 2006 after reduction for mandatory withholdings and retirement contributions will be roughly $2,510.00. Of that amount, as much as $627.50 may be garnished. Assuming Mr. Woody eliminates all payroll deductions not required by law to be withheld, with the exception of health insurance, and ceases payments toward his storage facility, his already tight monthly budget, once adjusted to reflect the real cost of living and to include a miscellaneous expense category, would not be capable of absorbing the loss of garnished income.

It should also be reiterated that in the event Mr. Woody's HEAL Loan is not discharged and remains outstanding upon his retirement or after he is no longer able to work, which is likely, his Social Security benefits may be offset against the obligation.[47] Because Mr. Woody does not have savings sufficient to support himself upon retirement or after he is no longer able to work, nondischarge of the HEAL Loan may cast Mr. Woody into destitution, as he will have insufficient savings and neither Social Security nor earning ability.

In light of the foregoing, Mr. Woody's gross income, insufficient to maintain even a minimal standard of living if he is forced to repay his HEAL Loan, weighs in favor of discharge.

**(2) Age, health, prospects and efforts for increased earnings.**

Mr. Woody is fifty-eight and rapidly approaching the age of retirement. His health, while currently stable, is that of a man who suffers from heart disease and who had a recent heart attack. Another heart attack or unexpected health problem will only worsen his current financial situation. Mr. Woody's testimony and the record show that he currently cannot work more hours, in addition to his work for the IRS, without suffering adverse health effects. Mr. Woody's past efforts to find

---

44. 15 U.S.C. § 1672(b).

45. *See* 15 U.S.C. § 1673(a); K.S.A. § 60–2310(b).

46. While not an absolute measure of the weekly earnings that are subject to garnishment, Mr. Woody's projected monthly income is an accurate, though not precise, gauge of earnings for the purposes of the Court's analysis.

47. *Lockhart v. United States,* —— U.S. ——, 126 S.Ct. 699, —— L.Ed.2d —— (2005) (concluding the United States may offset Social Security benefits to collect student loan debt that has been outstanding for over 10 years).

work and maximize his earning potential also show that he has continually sought work, even taking temporary positions when permanent positions where unavailable. Because of his student loan defaults and lack of disposable income, he was also unable to return to school to increase his earning potential and is now too old to receive a substantive benefit by doing so. In the end, Mr. Woody is now a man of limited capabilities and his lack of financial success, which is not contrived, should not be held against him.

### (3) Good faith.

■■■ Mr. Woody made only one payment of $484.48 toward the HEAL Loan in 1987 and did not request or receive a forbearance or otherwise participate in a repayment program. However, what is important is whether the lack of payments was justified.[48] Here, Mr. Woody's failure to make more than one payment and participate in a repayment program was justified because, despite reasonable efforts on his part, he was unable to earn income sufficient to reasonably warrant any attempt at repayment. Mr. Woody has continually sought and retained employment in his area of expertise and has maximized his capacity to earn. Mr. Woody's lifestyle is modest and unremarkable. He has minimized his expenses and has not lived frivolously. Although Mr. Woody has certain expenses that are voluntary and do not immediately affect his lifestyle, his income will be necessary, although likely inadequate, in the foreseeable future for inevitable expenditures, *e.g.*, vehicle, health, etc., that will be necessary to maintain the *status quo*. The equities of this case weigh in favor of Mr. Woody's good faith, and this Court will not condemn him because he is unable to afford repayment of the obligation despite his best efforts.

■■■ Mr. Woody has acted in good faith. Although Mr. Woody is currently living a minimal or meager lifestyle, he will not be able to do so if forced to repay the HEAL Loan. Any act to enforce and collect the HEAL Loan will force Mr. Woody either to choose between life's basic necessities or again to seek bankruptcy relief. There is no doubt that depriving an individual of the ability to afford life's basic necessities, such as health care, transportation, food, housing, utilities, or even the ability to care for one's self upon an impending retirement, would be "outside the limits of what is reasonable," "shockingly unfair, harsh, or unjust," or simply "outrageous." Therefore, within the facts and circumstances of this case, it would be unconscionable to deprive Mr. Woody of the means to maintain his health and minimal lifestyle by excepting the HEAL Loan from discharge. Mr. Woody is entitled to discharge his HEAL Loan debt.

### Conclusions

Congress has highlighted the importance of repaying student loan debt by placing a heightened burden for establishing the right to discharge on the student loan debtor. After substantial consideration and for the reasons outlined above, the Court finds Mr. Woody has satisfied his burden and is entitled to discharge, in their entirety, both the 523 Loan and the HEAL Loan.[49]

■■■■■■■■■■

---

**48.** *See Smitley,* 347 F.3d at 127–28 (Michael, J., dissenting).

**49.** The Court initially concluded at the hearing on this matter that it could partially dis-

charge Mr. Woody's HEAL obligation. However, after further consideration of the facts and law, the Court finds that partial discharge of Mr. Woody's HEAL obligation is inappropriate. Even if permissible, the nondischarge of any portion of Mr. Woody's HEAL obligation would be unconscionable under the facts and circumstances of this case.